# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DONALD WHITE,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 20-2059-KSM** |
| **WILLIAMS H. BUSH**, et al., | |
| Defendants. | |

## MEMORANDUM

**MARSTON, J.**                                                                **June 3, 2021**

Plaintiff Donald White sued Defendants Williams Bush and MJB Transports LLC ("MJB") after a motor vehicle accident, alleging that he suffered injuries to his neck and back after Bush—who was driving a MJB freightliner—"blew through a red light" and struck White's vehicle. (Doc. Nos. 1 & 16.)

Presently before the Court is White's Motion for Leave to File a Second Amended Complaint. (Doc. Nos. 19 & 34.) For the reasons discussed below, the Court grants Plaintiff's motion.

## I.      Factual Background

Accepting all allegations in the proposed Second Amended Complaint as true, the relevant facts are as follows.

On March 26, 2019 at 9:30 a.m., White was driving east on Chelten Avenue near the intersection with North 5th Street and, after seeing the stoplight turn green, proceeded to drive through the intersection. (Doc. No. 34-1 at ¶¶ 9, 11.) At the same time, Bush was driving a MJB freightliner for work and "blew through a red light" on North 5th Street. (*Id.* at ¶¶ 12, 16.) Bush

struck White's vehicle in the middle of the intersection, on the front driver's side.  (*Id.* at ¶ 14.)
The force of the impact pushed White's vehicle further into the intersection and ripped the front
bumper off of the freightliner.  (*Id.* at ¶¶ 18–19.)

    White alleges that, at the time of the accident, Bush was driving in excess of the 20 mile-
per-hour speed limit, was distracted, and was operating a cellular device.  (*Id.* at ¶¶ 15–17.)
White also claims that he suffered injuries to his back and neck as a result of the collision,
including disc bulges and ligamentous laxity.  (*Id.* at ¶¶ 22–23.)

    In January 2019, a couple months before the accident, Bush began working for MJB.  (*Id.*
at ¶ 33.)  MJB is owned by Michael Brooks.  (*Id.* at ¶ 34.)  Brooks received his commercial
driver's license ("CDL") in June 2018 and started MJB shortly thereafter.  (*Id.* at ¶ 35.)  Before
earning his CDL, Brooks had no background in trucking or safety.  (*Id.* at ¶¶ 37–38.)

    Brooks oversees the hiring process at MJB.  (*Id.* at ¶ 40; *see also id.* at ¶ 42 ("MJB
Transports did not use a hiring process when it hired the Defendant.").)  MJB did not have a
written hiring policy until November 2019, approximately ten months after Bush's date of hire.
(*Id.* at ¶ 60.)  At the time he hired Bush, Brooks was unsure of the steps he needed to take as part
of the pre-hiring process to comply with the Federal Motor Carrier Safety Regulations
("FMCSR").  (*Id.* at ¶ 41.)  As a result, Bush did not fill out a physical application, even though
completing such an application is required under the FMCSR.  (*Id.* at ¶ 47.)  The only physical
application MJB had on file for Bush was created in November or December 2019—well over
six months after the accident and at least ten months after Bush was hired—and back-dated to
Bush's date of hire, January 5, 2019.  (*Id.* at ¶¶ 48, 50.)  Moreover, that application was
completely blank.  (*Id.* at ¶ 49.)

    White claims that MJB violated several provisions of the FMCSR with respect to hiring

Bush.  (*See generally id.*)  For example, prior to hiring Bush, MJB failed to verify Bush's employment for the last three years, did not keep a record of its good-faith efforts to contact Bush's prior employers, and did not attempt to obtain Bush's drug and alcohol history from his prior employers.  (*Id.* at ¶¶ 52–53, 57, 61.)  Nor did MJB have Bush certify his commercial and personal driving violations or ask Bush to provide his prior license revocations, suspensions, or denials.  (*Id.* at ¶¶ 54, 56, 78.)  MJB also did not run a motor vehicle report or criminal background check on Bush.  (*Id.* ¶¶ 58–59.)  Overall, Brooks agrees that if a hiring process violates the FMCSR, the applicant is unable to operate a commercial vehicle.  (*Id.* at ¶ 51.)

In addition, White alleges that when Bush was hired, he was not provided with a copy of the FMCSR or any documents relating to hours of service.  (*Id.* at ¶¶ 64, 95.)  And as a more general matter, when an employee is hired at MJB, no one physically sits down with the employee to review the company's policies and procedures, nor does MJB provide its employees with a copy of the company's employee handbooks.  (*Id.* at ¶¶ 62–63.)

Aside from hiring, Brooks is also responsible for supervising and training his employees. (*Id.* at ¶ 40.)  At the time of Bush's hire, in January 2019, MJB did not have a written safety program.  (*Id.* at ¶ 65.)  MJB does not have monthly safety meetings with its employees.  (*Id.* at ¶ 86.)  Brooks believes that "as far as safety is concerned, I figure as long as we all stick to the basics, then we will be safe."  (*Id.* at ¶ 35.)

Brooks does not train employees *per se*, and no training sessions are provided to new employees.  (*Id.* at ¶¶ 66–67; *see also id.* at ¶ 97 ("MJB Transports does not train its drivers to refrain from using their cell phones.").)  Nor does MJB provide employees with continuing education programs.  (*Id.* at ¶ 69.)  Indeed, the only training process for new employees is a one-time ride-along, in which Brooks rides with the new employee.  (*Id.* at ¶ 79.)  And the only

"training" session Bush received while working at MJB was about "how to put out your triangles and stuff like that, and you know, basic truck stuff." (*Id.* at ¶ 68.)

As for supervision, MJB's only process for supervising employees is a ten to thirty-minute phone call in which Brooks checks in on the employee. (*Id.* at ¶ 70.) MJB does not record its annual review of its employees, nor does it check the electronic logging device ("EDL") regularly. (*Id.* at ¶¶ 84–85.) Further, there is no formal system in place at MJB to monitor the speeds of its employees/commercial drivers. (*Id.* at ¶ 85.)

MJB did not have written safety and supervision policies and procedures until November or December 2019—which, again, was many months after Bush's hire and the accident. (*Id.* at ¶ 71.) Likewise, MJB did not have any written policies or procedures regarding hours of service until that same time, which White alleges is in direct conflict with the company's safety certification and OP-1 agreement.[1] (*Id.* at ¶ 87; *see also id.* at ¶¶ 94–97.)

MJB does not have a disciplinary policy in place if a driver violates the Hours of Service limitations imposed by the FMCSR, even though MJB knows that if drivers do not comply with the Hours of Service requirements, they can get fatigued. (*Id.* at ¶¶ 93, 96.) Nor does MJB have a policy regarding cell phone usage by its employees. (*Id.* at ¶ 98.) And even though MJB does purport to have an "Accident Investigation Policy," pursuant to which drivers involved in a crash are supposed to fill out an accident report using the company's auto investigation kit, even the company's owner, Brooks, did not know what an auto investigation kit was and represented that

---

[1] To obtain a Department of Transportation ("DOT") number, an interstate company must submit an OP-1 form containing a Safety Certification, certifying to the Federal Motor Carrier Safety Administration ("FMCSA") that it has access to and is familiar with all applicable DOT regulations relating to the safe operation of commercial motor vehicles and that it and its employees will comply with the FMCSRs at all times while operating a commercial motor vehicle in the U.S. (*Id.* at ¶¶ 5–6.) As such, Defendants had to certify, for example, that they "had and will have in place a driver safety training/orientation program." (*See id.* at ¶ 6.)

he does not use an auto investigation kit at MJB. (*Id.* at ¶¶ 89–90.)[2] White also claims that MJB has a policy to "never admit anything" when it comes to accident investigations. (*Id.* at ¶ 99.)

As noted above, MJB did not complete a background check on Bush at his time of hire. During the period in which Bush was employed by MJB, the only criminal background check MJB ordered on Bush was run by a third party who Brooks "doesn't deal with." (*Id.* at ¶ 72.) To that end, MJB was unaware of Bush's criminal record until December 2, 2019. (*Id.* at ¶ 73.) The background check revealed the following, all of which occurred prior to Bush's hiring:

- On July 27, 2006, Bush pled guilty and was sentenced to possessing criminal tools;

- On July 27, 2006, Bush pled guilty and was sentenced for drug possession;

- On May 15, 2011, Bush pled guilty and was sentenced for carrying concealed weapons;

- On July 8, 2015, Bush pled guilty and was sentenced for having weapons while under disability.

(*Id.* at ¶¶ 74–77.)

At some point while Bush worked for MJB, Bush had other driving-related incidents, aside from the accident at issue in this case including, turning a corner and the back end of his tractor trailer flipping a car and clipping a construction street sign, and being convicted for making an improper turn. (*Id.* at ¶¶ 80–81.) However, Bush was not disciplined by MJB for these incidents. (*Id.* at ¶ 82.)

After the collision in this case, Bush received citations/violations with regard to his driving. On October 11, 2019, Bush received a citation for moving a vehicle unsafely in

---

[2] Pursuant to the Accident Investigation Policy, employees in a crash are supposed to go for a post-accident drug and alcohol analysis. (*Id.* at ¶ 91.) However, after the motor vehicle accident between Bush and White, Bush "was not required to go for a post-accident drug and alcohol analysis." (*Id.* at ¶ 92.)

Pennsylvania and was found guilty of this charge on November 15, 2019. (*Id.* at ¶¶ 100–01.) Again, Bush was not disciplined by MJB; in fact, Brooks did not know that Bush had even received the citation. (*Id.* at ¶ 102.) Then, on January 28, 2020, Bush was issued a violation for driving an excessive weight in Maryland, and on March 4, 2020—nearly a year after the instant collision—Bush's commercial license was suspended. (*Id.* at ¶¶ 103–04.) MJB was unaware that Bush's commercial license was suspended and Bush continued to operate MJB's tractor trailer. (*Id.* at ¶ 106.)

## II.    Procedural History

In March 2020, White initiated this action against Bush and MJB in state court. (*See* Doc. No. 1.) In his two-count complaint, White alleged that Bush acted negligently in causing the collision and that, as Bush's employer, MJB was vicariously liable for Bush's negligence. (*Id.*)

Defendants then removed the case to federal court (*see id.*) and filed a motion to dismiss (*see* Doc. No. 7). Defendants argued that Plaintiff's allegations that Defendants acted recklessly should be dismissed as conclusory and Plaintiff's allegations that Defendants violated unidentified statutes or laws should be dismissed as vague. (*See id.*) On May 26, 2020, the parties filed a joint stipulation, in which they agreed to dismiss the claim of "recklessness" and agreed to strike paragraphs 32(i)(j)(n)(o)(p) and (q) and 35(i)(j)(n)(o)(p) and (1) of the complaint. (Doc. No. 15.) This Court granted the Stipulation and denied the motion to dismiss as moot. (*Id.*) Two days later, on May 28, White filed an amended complaint that reflected those changes, again asserting the two negligence counts against Bush and MJB. (Doc. No. 16.)

Meanwhile, a few days prior, on May 25, the Court held a preliminary pretrial conference with the parties and issued a scheduling order. (*See* Doc. No. 12.) Pursuant to the scheduling

order, all motions to amend the complaint were due by June 19, 2020 and all fact discovery was to be completed by September 1, 2020.  (*Id.*)

On July 17, 2020—after the deadline to move to amend the complaint had passed and shortly after Plaintiff's counsel deposed Bush and Brooks—White moved for leave to file a second amended complaint.  (Doc. Nos. 19 & 34.)  The proposed second amended complaint includes the following additions:  allegations of recklessness against both Defendants; a third count—"Negligent and/or Reckless Hiring/Supervision/Retention"—against MJB; and a request for punitive damages.  (Doc. Nos. 19 & 34.)  Defendants oppose the motion, arguing that the proposed amendments would be futile.  (Doc. Nos. 26 & 35.)

For the reasons discussed below, we will grant Plaintiff's Motion for Leave to File a Second Amended Complaint.

## III.    Discussion

### A.    *Legal Standard*

Generally, a motion to file an amended pleading is governed by Federal Rule of Civil Procedure 15, which allows a party to "amend its pleading once as a matter of course within 21 days after serving it, or . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1).  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave," which should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The burden is on the party opposing the amendment, and the "touchstone of the rule is a showing of prejudice" to the opposing party.  *Price v. Trans Union, LLC*, 737 F. Supp. 2d 276, 279 (E.D. Pa. 2010).  "In the absence of substantial or undue prejudice, denial [of a motion to amend] must be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure

to cure deficiency by amendments previously allowed or futility of amendment." *Heyl &*
*Patterson Int'l, Inc. v. F. D. Rich Hous. of the V.I., Inc.*, 663 F.2d 419, 425 (3d Cir. 1981).

However, when a party seeks leave to amend a pleading after a deadline set by a court
order, "the decision whether to allow the amendment is controlled by Rule 16(b)," which states
that a scheduling order "may be modified only for good cause and with the judge's consent."
*Price*, 737 F. Supp. 2d at 279. Once the deadline in the scheduling order has passed, "the party
seeking the amendment is effectively asking the court not only for leave to amend its pleading,
but also the scheduling order," which means that the "party's request now implicates the
effective administration of justice." *Id.* Accordingly, the party must show "good cause in order
to procure the court's consent." *Id.*; *see also Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316,
318 (3d Cir. 2020) (affirming district court's denial of motion to amend because "Rule 16(b)(4)
applies once a scheduling-order deadline has passed, and Premier did not show good cause");
*Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 701 (E.D. Pa. 2007) ("[O]nce the
pretrial scheduling order's deadline for filing motions to amend the pleadings has passed, a party
must, under Rule 16(b), demonstrate 'good cause' for its failure to comply with the scheduling
order before the trial court can consider, under Rule 15(a), the party's motion to amend its
pleading.").

### B.    *Rule 16 Analysis*

Rule 16's good cause standard applies to White's Motion to File a Second Amended
Complaint. Because the deadline for amending the pleadings was June 19, 2020, and Plaintiff
did not file his Motion for Leave to File a Second Amended Complaint until July 17, 2020, we
will analyze the Motion under Rule 16 before turning to Rule 15. *See Premier Comp Sols., LLC*,
970 F.3d at 319 ("Before addressing Premier's arguments on appeal, we take this opportunity to

clarify that when a party moves to amend or add a party after the deadline in a district court's order has passed, the 'good cause' standard of Rule 16(b)(4) of the Federal Rules of Civil Procedure applies."); *Chancellor*, 501 F. Supp. 2d at 701 ("[O]nce the pretrial scheduling order's deadline for filing motions to amend the pleadings has passed, a party must, under Rule 16(b), demonstrate 'good cause' for its failure to comply with the scheduling order before the trial court can consider, under Rule 15(a), the party's motion to amend its pleading.").

Under Rule 16, the party moving to amend must demonstrate "good cause" for amending the scheduling order deadline. "'Good cause' under Rule 16(b) focuses on the diligence of the party seeking the modification of the scheduling order." *Price*, 737 F. Supp. 2d at 279; *see also* Fed. R. Civ. P. 16, advisory committee's note to 1983 amendment ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."); *Premier Comp Sols., LLC*, 970 F.3d at 319 ("[W]e have repeatedly recognized — and we reaffirm today — that whether 'good cause' exists under Rule 16(b)(4) depends in part on a plaintiff's diligence."). If the moving party "knows or is in possession of the information that forms the basis of the later motion to amend" before the deadline has passed, "the party is presumptively not diligent." *Price*, 737 F. Supp. 2d at 280.

The proposed second amended complaint includes, *inter alia*, allegations that MJB only possessed a back-dated and blank application for Bush (Doc. No. 34-1 at ¶¶ 47–50); that MJB did not conduct a criminal background check or run a motor vehicle report on Bush at the time of his hiring (*id.* at ¶¶ 58–59); that MJB did not require Bush to certify his commercial and personal driving violations (*id.* at ¶ 54); and that MJB did not have a training policy at the time it hired Bush and failed to properly train or supervise Bush (*see, e.g.*, *id.* at ¶¶ 66–68, 125(d)), all of which allegedly contravened the FMCSR. Plaintiff contends that such facts support his

recklessness allegations, new hiring/supervision/retention claim, and request for punitive damages.  (*See generally* Doc. No. 19).

Therefore, we must look to whether White has carried his burden of showing that this information was not discoverable, with diligence, before the amendment deadline of June 19, 2020.  The Court finds that White has met his burden.  Most—if not all—of the new information added to the proposed second amended complaint was not discoverable before the amendment deadline of June 19, 2020.  After all, Defendants did not respond to Plaintiff's Interrogatories (*see* Doc. No. 19-3 at pp. 41–46) or Plaintiff's Request for Production of Documents until July 10, 2020 (*see id.* at pp. 47–56); Bush was not deposed until June 25, 2020 (and Bush had to end the deposition early since he was driving while being deposed) (*see* Doc. No. 26-3); and Brooks was not deposed until July 16, 2020 (*see* Doc. No. 19-3 at pp. 144–246).  By way of example, White did not receive Bush's blank and back-dated application for employment until Defendants' July 10, 2020 document production, several weeks after the June 19 deadline for motions to amend, and therefore could not have included allegations related to that (and how that constitutes a violation of the FMCSR) beforehand.  (*See* Doc. No. 19, Ex. E at pp. 61–64.) Likewise, White claims that, during Brooks's deposition, he learned that Brooks did not know of Bush's criminal background until nearly a year after Bush was hired (Doc. No. 19 at ¶ 25) and that Brooks maintained an "incomplete" driver file for Bush (*id.* at ¶ 10).  White contends that he could not have received those admissions from Brooks before Brooks's July 16 deposition nor could he have amended his complaint to include such allegations before then.  (*See id.* at ¶¶ 33–34.)

Taken together, White largely identifies how, when, or from whom he learned the newly added information.  (*See generally id.*)  As such, the Court concludes that much of this

information was not discoverable before June 19, 2020 and finds that White has met his burden of demonstrating good cause for altering the deadline for amending the pleadings. *See Jeffers v. Am. Honda Fin. Corp.*, Civil Action No. 15-3181, 2016 WL 11697596, at *2 (E.D. Pa. Oct. 19, 2016) ("Given that the new allegations are premised on documents produced during discovery, I conclude that [the plaintiff] has acted with sufficient diligence. As such, he has demonstrated good cause under Rule 16."); *Trask v. Olin Corp.*, Civil Action No. 12-340, 2016 WL 1255302, at *7 (W.D. Pa. Mar. 31, 2016) (in a products liability case, holding that the plaintiff had shown good cause under Rule 16 to amend, where (a) plaintiffs "learned through discovery" that the defendants had knowledge of the gun's latent defect at the time of sale and information on the defendant's testing of the gun and (b) discovery also "yielded new information" that had not been previously available to them about a "feasible safer alternative design"); *Pulchalski v. Franklin County*, Civil No. 15-cv-1365, 2016 WL 1363764, at *2 (M.D. Pa. Apr. 6, 2016) (concluding that the plaintiff had demonstrated good cause to amend the court's scheduling order because the plaintiff "represented that counsel learned of additional information indicating that the plaintiff's employment was terminated in part for his FMLA-qualifying leave during initial discovery after filing his complaint" and the plaintiff "contend[ed] that he could not have come to know this information in a more timely manner"); *Cardone Indus., Inc. v. Honeywell Int'l, Inc.*, Civil Action No. 13-4484, 2014 WL 3389112, at *3 (E.D. Pa. July 11, 2014) (finding that the defendant established good cause to amend the scheduling order and allowing it leave to amend its answer to add proposed counterclaims, where the defendant identified twelve documents that had just been produced nine days before the defendant filed its motion to amend and provided support for the proposed counterclaims, thereby offering "a clear and cognizable explanation why the proposed counterclaims were not included in the original pleading").

Because White has demonstrated good cause under Rule 16 for reopening the deadline for amending the complaint, the Court now considers whether granting leave to amend would be proper under Rule 15.

### C.    *Rule 15 Analysis*

As noted above, under Rule 15, leave to amend should be freely given "when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). "Given the liberal standard under Rule 15(a), 'the burden is on the party opposing the amendment to show prejudice, bad faith, undue delay, or futility.'" *Cardon Indus., Inc.*, 2014 WL 3389112, at *4 (quoting *Chancellor*, 501 F. Supp. 2d at 700); *see also Goow v. Wittig*, 558 F. App'x 257, 259 (3d Cir. 2014) ("Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." (quoting *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000))). "Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Holst v. Oxman*, 290 F. App'x 508, 510 (3d Cir. 2008); *see also Anderson v. City of Philadelphia*, 65 F. App'x 800, 801 (3d Cir. 2003). Here, Defendants argue that the proposed amendments are futile. (Doc. No. 26-1 at pp. 5–9 & Doc. No. 35 at pp. 2–7.)

"In assessing futility, the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Holst*, 290 F. App'x at 510 (cleaned up); *see also Anderson*, 65 F. App'x at 801. To survive a motion to dismiss under 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully." *Id.* In reviewing a motion to dismiss the court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from those allegations. *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017). The court may also "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011) (quotation marks omitted).

Defendants argue that the proposed amendments are futile because the complaint lacks sufficient facts to support White's allegations that Defendants acted recklessly or that punitive damages are warranted. (*See generally* Doc. Nos. 26 & 35.) In short, Defendants take the position that "this is a case of, *at most*, ordinary negligence." (Doc. No. 35 at p. 6.)

"Recklessness is distinguishable from negligence on the basis that recklessness requires conscious action or inaction which creates a substantial risk of harm to others, whereas negligence suggests unconscious behavior." *Oum v. Dougherty*, Civil Action No. 20-cv-1970, 2021 WL 1163748, at *2 (E.D. Pa. Mar. 26, 2021) (quoting *Tayar v. Camelback Ski Corp.*, 47 A.3d 1190, 1200 (Pa. 2012)). "A defendant acts recklessly when 'his conduct creates an unreasonable risk of physical harm to another [and] such risk is substantially greater than that which is necessary to make his conduct negligent.'" *Castelli-Velez v. Moroney*, Civil No. 3:20-cv-00976, 2021 WL 978814, at *3 (M.D. Pa. Mar. 16, 2021) (citation omitted). To survive dismissal under the Rule 12(b)(6) standard, allegations need not "conclusively establish recklessness"; rather, "the court's obligation is merely to determine whether they create a plausible inference of recklessness, one which discovery will further substantiate." *Gula v. Advanced Cargo Transp., Inc.*, Civil No. 3:13-cv-226, 2013 WL 1899900, at *3 (M.D. May 7, 2013) (citations omitted).

In this case, White alleges that Bush was driving a MJB tractor-trailer for work, failed to stop at "a red light on N. 5th Street," "attempted to brake" but was unable to do so because he "was going at such an excess speed," "was distracted and was using a cell phone at the time," and consequently collided with White's vehicle. (Doc. No. 34-1 at ¶¶ 12–17.) White also claims that even after the collision, Bush "continued to drive [away] towards Godfrey Avenue," such that witnesses who had "gathered at the corner" "believed that [Bush] was going to leave the scene of the accident." (*Id.* at ¶¶ 20–21.) White further alleges that the collision caused White's vehicle to be pushed further into the intersection, ripped the front-bumper of the tractor-trailer off, and "caused severe injuries to the Plaintiff's neck and back." (*Id.* at ¶¶ 18–19, 22–23.)

Other courts in this Circuit have held that similar allegations of recklessness pass muster under the motion to dismiss standard. *See Castelli-Velez*, 2021 WL 978814, at *3 (denying motion to strike and dismiss allegations of recklessness where the plaintiff alleged that the defendant "failed to, *inter alia*, properly observe the road, apply his brakes, operate his vehicle to avoid a collision, maintain control over his vehicle . . . drive at appropriate speeds for conditions, remain attentive," which, if true, "may suffice to allege reckless behavior"); *Gula*, 2013 WL 1899900, at *3 (denying motion to dismiss where the plaintiff alleged that defendant Munozarevalo "operated his vehicle when he was so fatigued as to make it unsafe for him to operate the tractor trailer" and "operated his vehicle in excess of the applicable Hours of Service," determining that "in the aggregate, these allegations allow an inference that defendant Munozarevalo had a 'subjective appreciation of the risk' he posed to other drivers" (cleaned up)); *Oum*, 2021 WL 1163748, at *2 ("Plaintiff alleges that Defendant caused a multi-car rear-end collision by driving too fast and too close in violation of Pennsylvania motor vehicle rules, laws, and ordinances. Taking the allegations of the complaint in the light most favorable to

Plaintiff, speeding while tailgating or otherwise following too closely could establish recklessness."); *Maturo v. Pugh*, Civil Action No. 20-1464, 2020 WL 4015240, at *2 (E.D. Pa. July 16, 2020) (denying motion to dismiss where the plaintiff alleged that the driver "negligently and carelessly proceeded through the intersection," "made an improper left hand turn," drove at "at a high and excessive rate of speed," "did not keep his vehicle under proper and adequate control, violated state and county ordinances, laws, and statutes, and acted without due regard for [the plaintiff's] rights" (cleaned up)); *White v. Trybala*, No. 3:19cv14, 2019 WL 2119982, at *3 (M.D. Pa. May 15, 2019) (declining to strike allegations of reckless conduct at motion to dismiss stage where the plaintiff alleged that "Defendant Tomasz failed to stop for a red traffic signal" and "was driving a tractor-trailer, owned by Defendant J&J Trucking, in an endangering fashion when Defendant Tomasz violently struck Plaintiff Jerry White's vehicle, causing it to change direction on the state road").

As for MJB, White alleges, *inter alia*, that MJB failed to train or supervise Bush; that MJB failed to provide any safety programming; that MJB did not monitor the speeds of its drivers (including Bush) or check the EDL regularly; that MJB never disciplined Bush for his driving infractions; that MJB did not provide any information on Hours of Service requirements to Bush despite knowing that if drivers do not comply with said requirements, they can get fatigued; did not require Bush to fill out an application; and did not verify Bush's prior employment history or pull his motor vehicle report before hiring him. (*See* Doc. No. 34-1 at ¶¶ 47–50, 52, 65–70, 79, 82, 84–86, 93–95.) White also alleges that such actions violated the FMSCR. (*See generally id.*) Again, these allegations of recklessness are sufficient to survive under the motion to dismiss standard. *See, e.g.*, *Gula*, 2013 WL 1899900, at *4 (concluding that the allegations against Advanced Cargo—namely, that Advanced Cargo allowed its driver-

employee to "operate the truck when he was fatigued, in excess of the permissible time limit, and without proper training or supervision"—"while not conclusive as to recklessness, are sufficient to survive defendants' motion to dismiss because they allow the court to make an inference of reckless conduct").

Defendants' argument as to the futility of punitive damages fares no better. Under Pennsylvania law, "punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Hutchison v. Luddy*, 870 A.3d 766, 770 (Pa. 2005); *see also Cobb v. Nye*, No. 4:14-cv-0865, 2014 WL 7067578, at *4 (M.D. Pa. Dec. 12, 2014). In other words, "a showing of ordinary negligence is not enough to warrant punitive damages." *Hutchison*, 870 A.3d at 772.

In Pennsylvania, to state a punitive damages claim, a plaintiff must establish that "(1) [the] defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Hutchison*, 870 A.3d at 772. As the test makes clear—and as the Pennsylvania Supreme Court has repeatedly emphasized—in evaluating whether punitive damages are proper, "the state of mind of the actor is vital. The act, or failure to act, must be intentional, reckless, or malicious." *Id.* at 770 (cleaned up). And "because the question of whether punitive damages are proper often turns on the defendants' state of mind, this question frequently cannot be resolved on the pleadings alone but must await the development of a full factual record at trial." *Harvell v. Brumberger*, Civil No. 3:19-cv-2124, 2020 WL 6947693, at *8 (M.D. Pa. Nov. 4, 2020).

"Courts frequently decline to dismiss punitive damages claims where, as here, the plaintiff has alleged recklessness." *Castelli-Velez*, 2021 WL 978814, at *4 (collecting cases); *see also Harvell*, 2020 WL 6947693, at *8 (same); *Cobb*, 2014 WL 7067578, at *4 ("[B]ecause

Plaintiffs' claim for punitive damages rests on their allegations of gross, wanton, willful, and/or reckless conduct, Defendants' request to dismiss all such allegations is similarly denied.").

Likewise, "courts routinely deny requests to dismiss punitive damages claims in motor vehicle accident cases at the outset of litigation." *Tjokrowidjojo v. San Lucas*, Civil Action No. 20-6564, 2021 WL 1143379, at *2 (E.D. Pa. Mar. 25, 2021) (cleaned up) (collecting cases); *Harvell*, 2020 WL 69476993, at *8 (same); *see also Castelli-Velez*, 2021 WL 978814, at *3–4; *Harvell*, 2020 WL 6947693, at *9 (denying motion to dismiss and finding that the plaintiffs' allegations were sufficient to state a claim for punitive damages, where the plaintiffs alleged that the defendants "acted in a reckless fashion in a series of ways that violated the duty of care they owed to others, state traffic laws, and federal motor vehicle regulations—a fashion that resulted in the tractor trailer traveling outside of the lane of travel onto the shoulder where the plaintiffs were lawfully parked and violently striking [plaintiffs]"). "Courts have found that violations of the [FMCSR], coupled with allegations of a conscious disregard for the safety and rights of others, suffices to properly assert a claim for punitive damages." *Delamarter v. Couglar*, No. 3:16cv665, 2016 WL 3951663, at *2 (M.D. Pa. July 21, 2016) (collecting cases). In addition, "under Pennsylvania law, a plaintiff may recover punitive damages from a party under a theory of vicarious liability." *Molina*, 2020 WL 1637895, at *3 (quotation marks and citations omitted); *see also Gula*, 2013 WL 1899900, at *4.

At bottom, there is ample case law to support the Court's finding that White's punitive damages claims against Bush and MJB are not futile and survive under Rule 12(b)(6) at this point in time. For example, in *Tomassoni v. Farr*, the court concluded that it would be "premature" to dismiss the plaintiff's claims for punitive damages against the defendants at the motion to dismiss stage. Civil Action No. 3:11-CV-105, 2011 WL 846637, at *2 (M.D. Pa. Mar.

8, 2011). In that motor vehicle accident case, the plaintiffs pled that the driver, "Defendant Farr[,] operated his tractor trailer improperly, that he was so fatigued while driving that he could not properly operate the vehicle he was driving, and that he operated his vehicle in excess of the applicable hours of service." *Id.*; *see also White*, 2019 WL 2119982, at *3–4 (finding the plaintiffs pled sufficient facts to withstand the motion to dismiss their request for punitive damages where the plaintiff alleged that the defendant-driver ran a red light while driving a tractor-trailer owned by the defendant-trucking company).

As to the driver's employer, USA Track Inc., the *Tomassoni* plaintiffs alleged that "Defendant USA Track Inc. failed to properly train Defendant Farr, allowed him on the road despite inadequate training . . . and allowed him to continue driving even though the company knew that he was driving in excess of the applicable hours of service." *Id.*; *see also Delamarter*, 2016 WL 3951663, at *3 (denying motion to dismiss plaintiffs' claim for punitive damages against Cargo Transporters, Inc. ("CTI"), where the plaintiffs alleged that "CTI entrusted a tractor-trailer to [its employee-driver] without ascertaining his ability to operate the vehicle safely, despite the obvious risk of highly probable harm that would follow," and alleged that CTI "failed to properly supervise [its employee-driver] regarding I [sic] the appropriate operation of the vehicle in compliance with the FMSCR"); *Tjokrowidjojo*, 2021 WL 1143379, at *3 (holding that the plaintiff pled sufficient facts to state a claim for punitive damages where the plaintiff alleged that "Real Trucking hired and continued to employ [the driver] despite knowing, among other things . . . [that] he lacked the proper qualifications and training" and that "Real Trucking failed to properly train [the driver] before allowing him to operate the truck" and "failed to ensure employees complied with the rules, laws, and regulations governing the operation of commercial vehicles"). These allegations—especially those regarding the lack of proper training

and supervision—are similar to White's allegations in this case.

Having found that White pled facts sufficient to support his allegations of recklessness and request for punitive damages, the Court now addresses White's negligent hiring, supervision, and retention claim against MJB.[3]  As discussed above, with respect to his negligent hiring, retention, and supervision claim, White alleges, *inter alia*, that MJB failed to train or supervise Bush; that MJB did not monitor the speeds of its drivers (including Bush) or check the EDL regularly; that MJB did not require Bush to complete an application; that MJB did not verify Bush's prior employment history or pull his motor vehicle report before hiring him; and that these, and other actions, violated the FMSCR.  (*See* Doc. No. 34-1 at ¶¶ 47–50, 52, 65–70, 79, 82, 84–86, 93–95.)  The Court finds that these allegations are sufficient to survive under the Rule 12(b)(6) standard.  *See, e.g.*, *Jenson v. St. Louis*, No. 3:19cv515, 2019 WL 3765426, at *5 (M.D. Pa. Aug. 9, 2019) (denying motion to dismiss as to negligent hiring/supervision/retention claim where "plaintiffs alleged that the defendants were negligent in failing to properly train, monitor and/or supervise [the driver-employee]," that "defendants negligently hired and/or continued to employ [the driver-employee] despite knowing that his violation of FMSCA hours rendered him

---

[3] As the Honorable Mark Kearney in this District recently explained:

> While the Pennsylvania Supreme Court has not addressed the issue, federal courts in Pennsylvania have found a plaintiff cannot pursue a claim against an employer for negligent entrustment, hiring, supervision, or training when the employer admits that its employee was acting within the scope of employment when the accident occurred.  An exception to this rule exists when a plaintiff has made punitive damages claims against the supervisor defendant.

*Tjokrowidjojo*, 2021 WL 1143379, at *2.  In short, where, as here, the defendant-company does not contest that its employee-driver acted within the scope of his or her duties at the time of the accident and the plaintiff pled sufficient facts to state a valid claim for punitive damages, the exception to that rule applies.  *See id.* at *3–4 (denying motion for judgment on the pleadings as to the negligent hiring, retention, and supervision claim where defendant Real Trucking admitted that its employee-driver acted within the scope of his employment at the time of the accident and the plaintiff pled sufficient facts to state a valid claim for punitive damages).

unfit to safely operator [sic] a commercial vehicle, and despite his propensity for violating the

Rules of the Road and FMSCR"); *McMahon v. Arsenberger Trucking Co. Inc.*, Civil Action No.

17-1242, 2018 WL 4855458, at *9 (E.D. Pa. Oct. 5, 2018) (denying motion to dismiss negligent

hiring, retention, supervision, and entrustment claim where plaintiffs alleged "that Arsenberger

interviewed, hired, and trained Best in violation of the FMCSR and, along with Trucking Co.,

entrusted Best with a tractor-trailer knowing that he was improperly trained, inexperienced, and

unqualified, posing a risk of danger to others"); *accord Tjokrowidjojo*, 2021 WL 1143379, at *2

(denying motion for judgment on pleadings).

Notably, Defendants fail to cite to a *single* case in which a court dismissed a plaintiff's

request for punitive damages *at the motion to dismiss stage*.[4]  Nor do Defendants cite any case

where a court has denied a motion to amend the complaint to add a demand for punitive damages

because the amendment was futile.  Rather, Defendants cite to a host of inapposite cases that

largely occurred in the post-trial context or the summary judgment stage of litigation.  In short,

Defendants fail to cite to any binding case law that bears a resemblance to the factual context or

procedural history of this case.  (*See* Doc. No. 26-1 at pp. 7–8 & Doc. No. 35 at pp. 4–6.)  *See*

*Feingold v. Se. Pa. Transp. Auth.*, 517 A.2d 1270, 1277 (Pa. 1986) (holding that "it would be

inappropriate to assess punitive damages against SEPTA given its status as a Commonwealth

agency"); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 412, 429 (2003) (finding

---

[4] The closest Defendants come is *Smith v. Brown*, 423 A.2d 743 (Pa. Super. Ct. 1980), which involved a
motion to strike the punitive damages demand from a complaint.  *See Smith*, 423 A.2d at 744–46
(affirming the trial court's decision to grant motion to strike punitive damages demand from the
complaint, holding that the plaintiff failed "to plead any facts that could conceivably support a claim for
punitive damages" under Pennsylvania's pleading statute, and explaining that the plaintiff failed to
explain the conditions or factors that made the defendant's conduct "outrageous").  This case is easily
distinguishable given the facts pled in White's Second Amended Complaint, and in any event, *Smith* is
not binding on this Court.  *See, e.g.*, *Seiple v. Progressive N. Ins. Co.*, 954 F. Supp. 2d 352, 359 (E.D. Pa.
2013) ("I am not bound by *Sackett III*, which was a Superior Court opinion.").

that the jury's punitive damages award of $145 million was "neither reasonable or proportionate to the wrong committed" but stating, in dicta, that a punitive damages award "at or near the amount of compensatory damages," which was $1 million, would be justified); *Dubose v. Quinlan*, 125 A.3d 1231, 1240–41 (Pa. Super. Ct. 2015), *aff'd*, 173 A.3d 634 (Pa. 2017) ("We agree with the trial court that where the plaintiff established the reckless neglect of the nursing home resident, Mrs. Dubose, leading to the development of numerous festering bedsores, the matter of punitive damages was for the jury to decide . . . There was sufficient evidence of substandard care to the point of reckless indifference for the issue of punitive damages to go to the jury."); *Phillips v. Cricket Lighters*, 883 A.2d 439, 191 (Pa. 2005) (at the summary judgment stage, concluding that although the plaintiff "had adduced enough evidence to create a jury question on whether [the defendants] acted negligently in selling a butane lighter which lacked child safety devices," it was "readily apparent that the evidence [did] not show that the [the defendants] had some evil motive" or that their "conduct was so outrageous that the risk of harm [could] be said to be 'substantially greater' than that which would be posed by negligent conduct" such that punitive damages would be proper); *Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800, 803–04 (Pa. 1989) (concluding that the trial court properly instructed the jury on punitive damages and noting that punitive damages are meant to deter the tortfeasor and others from engaging in similar conduct and, as such, "[i]f the amount of punitive damages must bear a reasonable relationship to the injury suffered, then those damages probably would not serve as a deterrent"); *Focht v. Rabada*, 268 A.2d 157, 171 (Pa. Super. Ct. 1970) (concluding that "under the appropriate circumstances, evidence of driving while under the influence of intoxicating liquors may constitute a sufficient ground for allowing punitive damages" and ordering a new trial); *Takes v. Metro. Edison Co.*, 655 A.2d 138, 141 (Pa. Super. Ct. 1955) (appeal concerning

"whether the court improperly allowed the jury to consider negligence standards in their determination of entitlement to punitive damages").

Last, the Court understands Defendants' argument that the evidence in the record does not support the allegations of recklessness, punitive damages demand, or negligent hiring, retention, and supervision claim. (*See, e.g.,* Doc. No. 36 at p. 6.) But the Court notes that Plaintiff filed his motion to amend in July 2020, long before the deadline for discovery expired, and that the standard for futility is the same as that on a motion to dismiss—in other words, evidence is not required at this stage. Defendants speak in terms of the summary judgment standard, not the motion to dismiss standard. Defendants may, if appropriate, move for dismissal of these claims at the summary judgment stage.

## V. Conclusion

We grant White's Motion for Leave to File a Second Amended Complaint because he has shown good cause for the amendment as required by Rule 16 and the amendments would not be futile under Rule 15.

An appropriate Order follows.